UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-7-14
```

WAYNE RHONE,

                                    Plaintiff,

              - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                    Defendant.

**REPORT AND
RECOMMENDATION**

13-CV-5766 (CM)(RLE)

**MEMO ENDORSED**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/16/15
```

To the HONORABLE COLLEEN MCMAHON, U.S.D.J.:

### I.      INTRODUCTION

*Pro Se* Plaintiff Wayne T. Rhone ("Rhone") commenced this action under the Social

Security Act  (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner

of Social Security (the "Commissioner") denying his claim for disability insurance benefits.  On

April 1, 2014, the Commissioner filed a motion to remand for further proceedings.  (Def.'s Mem.

of Law in Supp. of Comm'r's Mot. to Remand ("Def. Mot.") at 2.)  In response, on April 7,

2014, Rhone filed a motion for judgment on the pleadings, asking the Court to overturn the final

administrative decision with respect to a finding of disability and remand the case solely for a

calculation of benefits.  He argues that the record compels the conclusion that he is disabled and

does not have the residual functional capacity to perform his past work.  (Doc. No. 20; Pl.'s Aff.

In Opp. to Mot. to Remand ("Pl. Mot.") at 1.) The Court agrees with both parties that the case

should be remanded, but concludes that remand for the sole purpose of calculating benefits has

not been demonstrated.  For the reasons that follow, I recommend that Rhone's motion be

1/15/2015 No objections having been received, and the time for filing objections having expired, the court adopts the Report as its opinion. The Commissioner's motion is GRANTED and the case is REMANDED for further proceedings

*[handwritten margin note:]* mailed/faxed/handed to counsel on 1/16/15

**GRANTED** in part and **DENIED** in part, and that the case be **REMANDED** for further administrative proceedings.

## II.    BACKGROUND

### A. Procedural History

On September 30, 2010, Rhone applied for Social Security Disability ("SSD") and Supplementary Security Income ("SSI") benefits, alleging disability since February 21, 2009. (*See* Tr. of Admin. Proceedings ("Tr.") at 81-84, 103.) The Social Security Administration ("SSA") initially denied Rhone's application on February 9, 2011, and on February 24, 2011, Rhone requested a hearing with an Administrative Law Judge ("ALJ"). (*Id.* at 22, 45-46, 49-54.) Rhone appeared and testified at a hearing before ALJ Wallace Tannenbaum on January 17, 2012. (*Id.* at 31-44.) The ALJ subsequently issued a decision on January 23, 2012, finding that Rhone was not disabled under the Act and was not entitled to disability insurance benefits. (*Id.* at 22-27.) The Appeals Council denied Rhone's request for review and the ALJ's decision became the Commissioner's final decision. (*Id.* at 1-4.) Rhone then filed this action.

### B. The ALJ Hearing and Decision

#### 1. Administrative Hearing Testimony

Rhone was born on August 25, 1961. (*Id.* at 35.) He is single and has no children. He completed high school, and worked as an actor for more than twenty years. (*Id.* at 36.) Rhone worked briefly as a 311 telephone operator, a park enforcement officer, and a ticket sales agent. (*Id.* at 36-37.) He stopped working in February 2009 when he was laid off from his work as a 311 telephone operator. (*Id.* at 35, 37.) He applied for unemployment insurance benefits and received those benefits for six months or longer. (*Id.* at 37.) While Rhone was receiving unemployment benefits, he continued to look for work. (*Id.*) He is no longer seeking

2

employment because of depression, anxiety, and other conditions that were not specified during the hearing. (*Id.* at 38.)

At the time of the hearing, Rhone saw a psychiatrist once a week. (*Id.*) Although no longer actively looking for work as an actor, he testified that he would not rule out working as an actor if he were to be "discovered." (Tr. at 40.) He testified that he stopped smoking marijuana and taking other drugs around the time that he started psychiatric treatment. (*Id.*) A normal day for him is spent indoors. He is "a bit claustrophobic," and suffers from anxiety and paranoia in crowds. (*Id.* at 40-41.) According to Rhone, this was part of the reason that he was not able to keep his 311 telephone operator job. (*Id.* at 41.)

Rhone testified to not having any friends and only interacting with his neighbors in passing. (*Id.*) He does not see his family because they live in Connecticut and he never travels to see them. (*Id.* at 43.) Although he does not engage in any recreational activities, Rhone does all of his own housekeeping, cleaning, and cooking. (*Id.*)

### 2. Medical Evidence

#### a. Ryan Chelsea Center and St. Luke's Roosevelt Hospital

Rhone's first visit to the Ryan Chelsea Center ("Ryan Center") was August 10, 2009. (*Id.* at 346.) He was diagnosed with hypertension and depression. (*Id.*) This was the same diagnosis on his next visit on September 23, 2009, but on that visit he also complained of wrist and arm pain. (*Id.* at 349.) On April 16, 2010, Rhone complained of right shoulder pain and left ankle pain. (*Id.* at 355.) He was diagnosed then with ankle pain, benign hypertension, and back pain. (*Id.*) On July 16, 2010, Rhone reported that the pain in his left ankle had persisted despite treatment. (*Id.* at 357.) He was diagnosed with Achilles tendinitis, in addition to a continuing case of hypertension. (*Id.*) On August 13, 2010, Rhone reported that he had been feeling

3

depressed and hopeless, with little interest in doing things. (*Id.* at 359.) In addition to his previous diagnoses of hypertension and tendinitis, he was also diagnosed with tobacco use disorder and hyperlipidemia.[1] (*Id.* at 359.)

In October 2010, Rhone visited St. Luke's Roosevelt Hospital's ("St. Luke's") twice, both times complaining of toothache. (*Id.* at 210, 214.) On his second visit to the emergency room on October 15, 2010, Rhone was given a round of antibiotics as treatment. (*Id.* at 214.) On January 11, 2011, Rhone went to the Ryan Center still complaining of tooth pain. (*Id.* at 364.) The treating physician for that visit gave him a tentative diagnosis of gingivitis. (*Id.*) Rhone's next two visits to the Ryan Center, on April 29, and November 16, 2011, were both for refills on his prescriptions and did not result in any diagnoses beyond those for benign hypertension. (*Id.* at 366-68.)

### b. Jewish Board of Family and Children's Services Records

Rhone was treated at Jewish Board of Family and Children's Services ("JBFCS") from 2008 to 2012. (Tr. at 219-303, 391-535.) He initially sought treatment with JBFCS on March 18, 2008, at which point he was diagnosed with anxiety, depression, and lack of impulse control because of an inability to control his worries. (*Id.* at 219.) He was also found to be at moderate risk of substance abuse. (*Id.* at 228.) Because of problems with his health insurance, Rhone did not return to JBFCS until August 31, 2009. (*Id.* at 242.) At that time, JBFCS staff diagnosed him with depression and anxiety, as well as substance control issues based on the fact that he had suffered a relapse after two years of sobriety. (*Id.* at 242-43.) JBFCS staff also diagnosed Rhone as having a low level of risk for suicide because of his passive thoughts of death. (*Id.* at 250.)

---

[1] "Hyperlipidemia" is a general term for elevated concentrations of any and all of the lipids in the plasma. *See Dorland's Illustrated Medical Dictionary*, 795 (28th ed. 1994).

4

On September 11, 2009, JBFCS staff reiterated Rhone's diagnoses of depression, anxiety, and alcohol and cannabis abuse. (*Id.* at 417.) On October 5, JBFCS staff noted that "alcohol and marijuana use is a very serious factor at this time." (*Id.* at 413.) In a December 11 report, staff noted that Rhone had begun attending Alcoholics Anonymous ("AA") meetings, was able to explore the factors surrounding his sobriety, and was considering other types of addiction treatment. (*Id.* at 264.) JBFCS reports include a "risk assessment section" which invites staff to select one of four options - "elevated risk," "concern of risk," "low risk," and "minimal risk" - to describe a patient's status with a variety of health problems. Staff assessed Rhone's status with substance abuse on December 11 to be "concern of risk." (*Id.* at 265.)

In a March 12, 2010 report, staff indicated that Rhone had been sober since December 2009, and that he was attending AA meetings regularly and coping well with the associated social anxieties. (*Id.* at 272.) In a June 11, 2010 report, staff indicated that Rhone was sober but attending AA meetings irregularly, and his risk assessment was still "concern of risk." (*Id.* at 280-81.) Staff noted that Rhone needed to slow down because his Achilles tendinitis provoked feelings of anxiety and irritability. (*Id.* at 280.)

In the September 10, 2010 report, staff indicated that Rhone was still attending AA meetings irregularly and making good use of them to process his issues. (*Id.* at 288.) Staff also indicated that Rhone's tendinitis was remitting and, as a result, he reported less frustration. (*Id.*) Staff reported that Rhone was exhibiting less social anxiety and engaging in more social situations, which triggered feelings of anxiety for him. (*Id.*) In the December 10, 2010 report, staff indicated that, although Rhone was sober, he was no longer attending AA meetings. (*Id.* at 296.) Staff also stated that Rhone had experienced considerable social anxiety when

5

participating in a community-broadcasting project and that a recent severe dental infection had triggered an emotional response to pain for him. (*Id.*)

In the March 11, 2011 report, staff described Rhone as struggling with financial, occupational, and medical stressors. (*Id.* at 474.) Rhone needed a root canal, but was unable to afford it. (*Id.*) Rhone reported that he had relapsed to cope with his tooth pain, but that he had been sober since he acknowledged his relapse in a prior psychotherapy session. (*Id.*) In the June 10, 2011 report, staff noted that Rhone was maintaining his sobriety and had attended an addictions group, although he had stopped attending AA meetings because of social anxiety. (*Id.* at 482.) In the August 22, 2011 report, staff indicated that Rhone was sober but currently facing housing trouble with the possibility of eviction. (*Id.* at 492.) In the November 1, 2011 report, Rhone's therapist, Andrea Levin, L.C.S.W., noted that Rhone continued to face social anxiety. (*Id.* at 500.) In a February 2, 2012 report, staff indicated that Rhone's social anxiety and housing issues continued, compounded by the death of his cousin. (*Id.* at 509.) In this report, Levin noted that Rhone was more focused on his depression. (*Id.*) In the last JBFCS report on record, dated May 3, 2012, staff reported Rhone to be sober and still suffering from social anxiety. (*Id.* at 518.) In the same report, Levin changed Rhone's diagnosis to dysthymic disorder.[2] (*Id.*)

### c.  Psychiatric/Psychological Impairment Questionnaire by Andrea Levin

On June 20, 2012, Levin filled out a Psychiatric/Psychological Impairment Questionnaire regarding Rhone. In this questionnaire, she stated that Rhone had been receiving mental health treatment since August 31, 2009, with weekly individual visits and monthly psychiatric visits at JBFCS. (*Id.* at 383.) Levin diagnosed Rhone with appetite disturbance with weight change.

---

[2] "Dysthymic Disorder" is a mild but long-term (chronic) form of depression, whose symptoms often last for at least two years and often longer. *See* Mayo Clinic, *Dysthmia*, www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879.

sleep disturbance, mood disturbance, emotional lability,[3] substance dependence (in remission), feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, and generalized persistent anxiety. (*Id.* at 384.) Levin identified Rhone's primary symptoms as "sleep disturbance, frequent tearfulness/lability, irritability, social withdrawal, difficulty controlling worries, feelings of hopelessness/worthlessness, reduced energy… [and alcohol] and cannabis abuse (in remission)." (*Id.* at 385.) Levin noted that all of the symptoms were frequent and/or severe, except for the substance abuse. (*Id.*)

Levin declined to comment on Rhone's ability to work, stating that it was "outside [her] purview to hypothesize about [a] patient's potential performance in a work place." (*Id.* at 386.) She stated that Rhone's impairments were ongoing, and created an expectation on her part that they would last for at least 12 months. (*Id.* at 389.) Additionally, she noted that Rhone's "severe tendinitis of 2010 appeared to be exacerbated by anxiety and depression." (*Id.*) In her medical opinion, the earliest date that Rhone could have begun experiencing these symptoms and limitations was July 2009. (*Id.* at 390.)

### d. Dr. Thresiamma Mathew – Orthopedic Evaluation

On December 22, 2010, Rhone was examined at Industrial Medicine Associates, P.C. by Thresiamma Mathew, M.D. (*Id.* at 178.) Rhone had been referred to Dr. Mathew by the Division of Disability Determination. (*Id.*) Rhone reported that he had been experiencing low back pain for a few months, which was gradually worsening. (*Id.*) He also reported left ankle pain, which was also gradually worsening and was aggravated by prolonged standing, walking, and climbing. (*Id.*) Dr. Mathew diagnosed Rhone with low back pain; left ankle pain, probably secondary to Achilles tendinitis; and a history of hypertension, stomach ulcer, anxiety, depression, and

---

[3] In psychiatry, "emotional lability" is defined as emotional instability or rapidly changing emotions. *See Dorland's Illustrated Medical Dictionary*, 891 (28th ed. 1994).

posttraumatic stress disorder. (*Id.* at 180.) Dr. Mathew indicated that the prognosis for Rhone's low back pain, left ankle pain, hypertension, and stomach ulcer was "fair" with physical therapy and medication. (*Id.* at 181.) She declined to state a prognosis for Rhone's mental disorders. (*Id.*) Dr. Mathew concluded that Rhone "ha[s] a moderate limitation in lifting and carrying heavy items, bending forward, prolonged walking, squatting, and climbing up and down the stairs and mild to moderate limitation in prolonged sitting and standing." (*Id.*)

### e.  Dr. Christopher Flach – Adult Psychiatric Evaluation

Rhone visited Christopher Flach, Ph.D., of Industrial Medicine Associates, P.C., for an Adult Psychiatric Evaluation on December 30, 2010. (*Id.* at 183.) Rhone reported difficulty sleeping, depressive symptoms, mostly sad moods, anxiety, and panic attacks that occurred three or four times a day. (*Id.*) Dr. Flach concluded that Rhone was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently. (*Id.*) Additionally, Dr. Flach concluded that Rhone could make appropriate decisions and adequately relate to others. (*Id.*) Dr. Flach noted that Rhone had mild problems dealing with stress. (*Id.*) Accordingly, he found that Rhone's psychiatric problems were not significant enough to interfere with his ability to function on a daily basis. (*Id.*)

### f.  Dr. V. Reddy – Mental Residual Functional Capacity Assessment

On February 7, 2011, Dr. V. Reddy conducted a psychiatric review of Rhone in which he rated Rhone's functional limitations and conducted a mental residual functional capacity assessment. (Tr. at 154.) Rhone reported to Dr. Reddy that he felt depressed every day, avoided socializing with groups of people, and had "panic attacks with trembling and sweating several times a day under stressful situations." (*Id.* at 170.) After examining Rhone and the medical

8

evidence on record, Dr. Reddy diagnosed Rhone with depressive disorder, *id.* at 157; generalized anxiety disorder, *id.* at 159; and alcohol and cannabis abuse, *id.* at 162. In his rating of functional limitations, Dr. Reddy determined that Rhone's disorders imposed mild restrictions on his activities of daily living and mild difficulties in maintaining social functioning. (*Id.* at 164.) He found that Rhone had moderate difficulties in maintaining concentration, persistence and pace. (*Id.*) Additionally, Dr. Reddy noted that Rhone had never had "repeated episodes of deterioration" of extended duration. (*Id.*) Thus, Dr. Reddy concluded that Rhone's limitations fell below the level required to satisfy the functional criteria for paragraph "B."[4] (*Id.*) Dr. Reddy also concluded that Rhone failed to satisfy the paragraph "C"[5] requirements, because Rhone's affective disorder did not cause more than a minimal limitation on his ability to do work or function outside of his home. (*Id.* at 165.)

In his mental residual functional capacity assessment, Dr. Reddy concluded that Rhone was moderately limited in his ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination and proximity to others without being distracted by them, and to perform activities with a schedule, maintain regular attendance, and be punctual. (*Id.* at 168.) According to Dr. Reddy, Rhone was also moderately limited in his ability to complete a normal work day or work week and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 169.) He was similarly limited in the ability to interact appropriately with the general public, respond appropriately to criticism from supervisors, get along with co-workers

---

[4] "Paragraph B" lists a set of impairment-related functional limitations, incompatible with the ability to do any gainful activity, which need to be satisfied when evaluating whether an individual has a mental disability under the SSA. *See* Social Security, *Disability Evaluation under Social Security*, www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.
[5] Another set of impairment-related functional limitations, incompatible with the ability to do any gainful activity, which is assessed if the paragraph "B" criteria are not satisfied. *See id.*

without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in a work setting, and set realistic goals or make plans independently of others. (*Id.*)

Dr. Reddy found that Rhone's statements about his symptoms were credible, and that his attention, concentration and memory were intact. (*Id.*) Dr. Reddy based his conclusions on Rhone's reports that he was independent in self-care activities, prepared his own meals, performed household chores, managed money, and shopped and traveled independently. (*Id.*) Additionally, Dr. Reddy noted that Rhone's therapist had indicated that Rhone was continuing to branch out more socially. (*Id.*) Dr. Reddy ultimately adopted Dr. Flach's conclusion, stating that Dr. Flach found Rhone to be "able to perform entry level tasks in a low personal contact setting" and that his opinion was "supported by [the medical evidence] and [was] thus adopted." (*Id.*)

### g. Dr. J. Koncak – Physical Residual Functional Capacity

Dr. J. Koncak performed Rhone's physical residual functional capacity assessment on February 9, 2011. (*Id.* at 172.) Rhone alleged a disability because of his ankle problem, which caused him to have difficulty walking. (*Id.* at 173.) Dr. Koncak found that Rhone could occasionally lift or carry a maximum of ten pounds, frequently lift or carry less than ten pounds, stand or walk for a total of at least two hours in an eight-hour workday, and sit, with normal breaks, for a total of about six hours in an eight-hour workday. (*Id.*) He also determined that Rhone had Achilles tendinitis, trouble walking because of ankle pain, left ankle tenderness, and low back pain. (*Id.*) Dr. Koncak concluded that Rhone had a residual functional capacity for sedentary work. (*Id.* at 173-74.)

### h. FEGS Biopsychosocial Summary

Federation Employment & Guidance Service ("FEGS") staff prepared a Biopsychosocial Summary regarding Rhone on March 9, 2011. (*Id.* at 304.) In the summary, FEGS staff noted that Rhone had a history of alcohol, marijuana, and cocaine abuse, but had been sober for three years. (*Id.* at 310.) FEGS staff noted that Rhone was able to travel independently and perform basic self-care activities. (*Id.* at 313.) During FEGS's examination, Rhone reported hearing voices of a "non-command nature" telling him to harm himself or others. (*Id.* at 312.) FEGS staff noted that Rhone had "substantial functional limitations to employment" because of medical conditions that "will last for at least 12 months and make [him] unable to work." (*Id.* at 322.) To support this disposition, the staff noted that Rhone had severe depressive disorder and generalized anxiety disorder (*Id.* at 323, 341.)

### 3. ALJ Wallace Tannenbaum's Decision

On January 23, 2012, ALJ Wallace Tannenbaum issued his decision stating that Rhone was not disabled under sections 216(i) and 223(d) of the Act and had not been disabled since February 21, 2009, the date that Rhone alleged the disability began. (Tr. at 22-27.) Although the ALJ found that Rhone had the severe impairments of low back pain, history of stomach ulcers, depression, and anxiety, he found that Rhone did not have an impairment or combination of impairments severe enough to meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart p, Appendix 1. (*Id.* at 24.) To support this conclusion, the ALJ cited Dr. Reddy's determination that Rhone did not meet any of the "paragraph B or paragraph C" criteria. (*Id.* at 164-65.)

The ALJ further found that even if Rhone had an impairment or combination of impairments that could be considered severe, he still had the residual functional capacity to

11

perform light work as defined by 20 C.F.R. § 404.1567(b).  (*Id.* at 25.)  The ALJ noted that Rhone's only limitation on his ability to work was that he was unable to work in crowded environments.  (*Id.* at 25.)  To support this conclusion, the ALJ cited Rhone's treatment at the Ryan Center in 2010, where he was diagnosed with benign hypertension and depression.  (*Id.* at 25.)  He also relied on Rhone's treatment at JBFCS, noting that more recent records showed that Rhone was in better control of his substance abuse and was engaging more socially.  (*Id.* at 26.)  The ALJ also cited Dr. Flach's conclusion that Rhone did not have any vocationally significant mental limitations other than a mild difficulty dealing with stress.  (*Id.* at 185.)  He relied on the FEGS report, which noted that Rhone was calm and cooperative, with normal concentration and memory.  (*Id.* at 26.)  Finally, he also relied on Rhone's testimony that if he were to be offered theatrical work, he would take it.  (*Id.* at 27.)  The ALJ noted that "significant weight has been given to the findings and opinions of the examining sources in the record."  (*Id.* at 27.)  He determined that the findings of both the examining sources and the treating sources showed that Rhone's limitations were mild in severity.  (*Id.*)  The ALJ concluded that Rhone had the RFC to work as an actor or pari-mutuel clerk, the latter of which would involve conducting ticket sales for off-track betting, because "neither of [those] jobs require more than light work exertion and do not subject him to the stress of crowded environments."  (*Id.*)

### III.    DISCUSSION

**A.  Standard of Review**

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v.*

*Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21

(1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry."

*Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the

Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g);

*Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord

*Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is

supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's

decision meets both of these requirements, the reviewing court must affirm; if not, the court may

modify or reverse the Commissioner's decision, with or without remand. *Id*.

 An ALJ's failure to apply the correct legal standard constitutes reversible error, provided

that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord*

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an

applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See*, e.g., *Kohler*,

546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In

such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008)

(citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

 If the reviewing court is satisfied that the ALJ applied correct legal standards, then the

court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's

decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). The ALJ must discuss the "crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence."

*Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F.

15

Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5). A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis).  The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities.  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-part process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms."  20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at

49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so

that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."

20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has

"discretion in weighing the credibility of the claimant's testimony in light of the other evidence

of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979));

*see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be

"consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG),

2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility

determination). In determining whether there is any other work the claimant can perform, the

Commissioner has the burden of showing that "there is other gainful work in the national

economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)

(citation omitted).

    **2.**    **The Treating Physician Rule**

    The opinion of a claimant's treating physician is generally given more weight than the

opinion of a consultative physician because the treating physician is likely "most able to provide

a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)

(discussing the "treating physician rule of deference"). A treating physician's opinion is entitled

to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the

medical opinion of a treating physician must attempt to fill any clear gaps in the administrative

record. *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the

weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good

reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir, 2012)

(finding reversible error where an ALJ failed to explain his determination not to credit the

treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own

judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## C. Issues on Appeal

The Parties agree that some degree of remand is required. Rhone argues that remand

should only be for calculation of the benefits because the administrative record provides

persuasive proof of disability and further proceedings would serve no purpose. (Pl. Letter to the

Ct. at 1-8; Pl. Mot. at 1.) In his letter to the Court, Rhone further argues that new medical

conditions that developed after his hearing support his argument for persuasive proof of

disability. (Pl. Letter to the Ct. at 4.) The Commissioner argues that remand is appropriate

because the ALJ (1) failed to fully evaluate the medical source opinions; (2) did not carefully

consider the non-exertional demands of Rhone's past work experience in determining that Rhone

was not disabled at step four of the sequential evaluation; and (3) may have failed to adequately

inform Rhone of his right to counsel during the administrative hearing. (Def. Mot. at 3.) The

Commissioner, however, maintains that the remand should be for the purpose of further

administrative proceedings, and not limited to the calculation of benefits. (*Id.* at 2.)

### 1.  The Case Should Be Remanded for Further Administrative Proceedings.

A court should order remand to determine payment of benefits only where the record

contains "persuasive proof of disability" and remand for further evidentiary proceedings would

serve no further purpose. *Schall v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v.*

*Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Remand for further administrative proceedings is

appropriate "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83. As discussed below, the Court concludes that the limited remand urged by Rhone is not supported and recommends that this case be remanded for a supplemental hearing to further develop the record.

### a. The ALJ failed to fully evaluate the medical source opinions.

The ALJ failed to fully evaluate the medical source opinions of record pursuant to 20 C.F.R. § 404.1527 by giving insufficient weight to treating sources. The ALJ only briefly discussed Rhone's physical limitations, and relied mainly on Dr. Mathew, the consultative orthopedist, when making his determination on the severity of those limitations. (*Id.* at 25-26.) Although he focused on Rhone's mental limitations as his primary limiting impairments, (*id.* at 26), he did not consider Rhone's whole treating history at JBFCS or even the most recent parts of that history. He noted "more recent [JBFCS] records from March 2010 show that [Rhone] had better control of his substance abuse problems." (*Id.* at 26.) However, JBFCS reports after March 2010 showed that Rhone had suffered a substance abuse relapse. (*Id.* at 474.) Moreover, the ALJ relied on a December 2010 JBFCS report in which staff indicated that Rhone had participated in a community broadcasting project and was engaging more socially. (*Id.* at 26, 296.) However, in the same report, staff also indicated that Rhone had faced considerable social anxiety when participating in that project. (*Id.* at 296.) Moreover, JBFCS reports after December 2010 highlighted Rhone's continuing struggle with social anxiety, as well his increasing focus on his depression. (*Id.* at 500.)

The ALJ also did not adequately take into account the opinion of Rhone's therapist, Dr. Andrea Levin. (*Id.* at 383.) When determining that Rhone was able to do light work except that he could not work in crowded environments, the ALJ relied solely on Dr. Flach, Rhone's

20

consultative psychologist. (*Id.* at 25-26.) Dr. Flach determined that Rhone's psychiatric problems were not significant enough to disrupt his ability to function on a daily basis, (*id.* at 185), and found that Rhone had only mild problems dealing with stress. (*Id.* at 185.) Although Dr. Levin did not make a determination about Rhone's ability to function in a work environment, (*id.* at 386), she did note that Rhone experienced appetite, sleep, and mood disturbance, emotional lability, substance dependence (in remission), feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, and generalized persistent anxiety. (*Id.* at 384.) She also identified his primary symptoms, such as "sleep disturbance, frequent tearfulness/lability, irritability, social withdrawal, difficulty controlling worries, feelings of hopelessness/worthlessness, reduced energy... [and alcohol] and cannabis abuse (in remission)." (*Id.* at 385.) She noted that Rhone's psychological condition tended to exacerbate his physical symptoms and that his symptoms could be expected to last for more than twelve months. (*Id.* at 389.) The ALJ failed to note that Levin's findings, as a treating physician, contradicted those of Dr. Flach, an examining physician. (*Id.* at 185.) The ALJ also failed to consider the interplay between Rhone's psychological and physical problems. (*Id.*)

An ALJ's failure to explain the weight ultimately given to the opinion of treating physicians is also a ground for remand. *See* 20 C.F.R. § 404.1527(e)(2); *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998). The ALJ failed to provide an adequate explanation of the weight given to the treating sources, stating only that the findings of the examining sources were consistent with the treating source records. (Tr. at 27.)

Furthermore, the ALJ failed to adequately take into account the opinion of the FEGS's staff. (*Id.* at 26.) The FEGS examiner found that Rhone had substantial functional limitations to employment that would last at least twelve months. (*Id.* at 322.) FEGS found that Rhone has

had "[symptoms] despite long term [treatment] and reduced sustained concentration recent memory tolerance for stress and ability to adhere to a regular work routine [sic]....", (*id.* at 323, 341,) and recommended psychotherapy and medication. These findings, unlike those of Dr. Flach and Dr. Mathew, suggest that Rhone would not be able to function in a work environment. The ALJ's failure to fully evaluate the medical source evidence pursuant to 20 C.F.R. § 404.1527 is grounds for remand for further proceedings.

<blockquote>

**b.    The ALJ did not fully consider the non-exertional demands of Rhone's past work.**

</blockquote>

The ALJ did not fully consider the non-exertional demands of Rhone's past work as an actor and pari-mutuel clerk when determining his RFC at step four of the sequential process. Non-exertional impairments include difficulty functioning because of nervousness, anxiety, or depression. *See* 20 C.F.R. § 4040.1569(a).

The ALJ failed to fully consider the effect that Rhone's depression and social anxiety had on his ability to perform past relevant work. The ALJ noted that Rhone had "primary limiting impairments" of "depression and anxiety," but did not address the effect of those impairments on his ability to perform his past relevant work beyond a conclusory statement that "neither [work as an actor nor as a pari-mutuel clerk] ... require more than light work exertion and do not subject him to the stress of crowded environments." (*Id.*) Accordingly, the ALJ failed to give due consideration to the non-exertional demands of Rhone's past work.

<blockquote>

**c.    The ALJ may have failed to adequately inform Rhone of his right to counsel during the administrative hearing.**

</blockquote>

The ALJ may have failed to adequately inform Rhone of his right to counsel at the administrative hearing. *See Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) ("At the hearing itself, 'the ALJ must ensure that the claimant is aware of [his] right [to counsel]'") (quoting

*Robinson v. Sec'y of Health and Human Servs.*, 733 F.2d 255, 257 (2d Cir. 1984)). Although it is true that "when notifying a claimant of an adverse determination, the Commissioner ... must 'notify the claimant in writing' of (1) her 'options for obtaining [an] attorney[ ] to represent [her]' at her hearing, and (2) 'the availability ... of ... legal services organizations which provide legal services free of charge.'" *Lamay v. Astrue*, 562 F.3d at 507 (quoting 42 U.S.C. §§ 406(c)). it is unclear whether the ALJ has to inform the claimant of the availability of free legal services at the hearing itself.

Courts are split on whether the notice of hearing can adequately inform a plaintiff of their right to counsel. *Guzman v. Califano*, 480 F. Supp. 735, 736 (S.D.N.Y. 1979) (Adequate notice found where claimant informed of right to counsel in notice of hearing); *Rivera v. Chater*, 942 F. Supp. 178, 183 ("Because Rivera was notified of her right to representation prior to the hearing and because she acknowledged at the hearing that she wished to proceed alone, the Court finds that she was adequately informed of her right to representation."); *but see Vega*, 549 F. Supp. at 716; *Delgado ex rel. Santiago*, 88-CV-2367 (RPP), 1989 WL 280340 at *5.

At the hearing, the ALJ informed Rhone that he had a right to a lawyer, but did not inform him of the availability of free legal services. (Tr. at 33.) Rhone is an English speaker and presumably understood the notice he received. *See generally Vega v. Schweiker*, 549 F. Supp. 713, 716 (S.D.N.Y. 1982) (discussing how plaintiff's lack of facility in English can render a notice of hearing written in English immaterial). However, unlike in the cases discussed above, the ALJ did not specifically mention the notice of hearing when asking Rhone about his knowledge of his right to counsel, nor did he mention the availability of free legal counsel. (Tr. at 33.) The ALJ's failure to reference or confirm the information in Rhone's hearing notice leaves open the possibility that Rhone was not adequately informed of his right to counsel.

23

**d.     The development of additional ailments within the insured period requires the filing of a new claim.**

Rhone claims to have developed further ailments, including rheumatoid arthritis, after the

hearing, but before December 31, 2013, the last date he was insured for disability insurance

benefits. (Pl. Letter to the Ct. at 4; Tr. at 22.) The evidence of further ailments may be material

to a substantive disability claim on Rhone's part, but the evidence does not relate to illnesses

already on the record, and therefore it does not fall within the purview of this claim. *Cf. Jones v.*

*Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (ordering remand to determine whether plaintiff had

good cause for his failure to introduce new medical evidence concerning the illness on record).

Even if the new evidence was material to the illnesses on record, this Court cannot consider new

evidence *de novo. Flanigan v. Colvin*, No. 13-CV-4179 (AJP), 2014 WL 1979927, *17

(S.D.N.Y. 2014).

**2.  The Record Does Not Compel The Conclusion That Rhone Is Disabled.**

This Court may enter conclusive findings on Rhone's behalf only if "the record provides

persuasive proof of disability and a remand for further evidentiary proceedings would serve no

purpose." *Parker*, 626 F.2d at 233. Although the record supports the assertion that Rhone does

have some limitations, it does not definitively support the assertion that Rhone is disabled.

Multiple examining sources, such as Dr. Flach, Dr. Reddy, and Dr. Mathew, have come to the

conclusion that Rhone does not have impairments severe enough to prevent him from working.

(Tr. at 170, 173, 185.) Although Rhone's medical records indicate that he does suffer from back

and ankle pain, they do not demonstrate that the pain severely limits him to the point of

disability. The severity of Rhone's anxiety and depression are also unclear. Examining sources,

such as Dr. Reddy and Dr. Flach, determined that Rhone's depression and anxiety do not affect

his ability to work. (*Id.* at 185.) While the findings of Dr. Levin differ from the findings of Dr.

24

Flach, the fact that she has refused to comment on Rhone's ability to function in a workplace has a negative impact on the persuasiveness of her findings. (*Id.* at 386.) As such, there is not enough information in the record to definitively prove Rhone's disability, and remand for further administrative proceedings would serve a purpose.

### IV.   CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's motion be **GRANTED** and the case **REMANDED** for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections will be filed with the Clerk of the Court and served to all adversaries, with extra copies delivered to the chambers of the undersigned, 500 Pearl Street, 1970.  Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas c. Arn*, 474 U.S. 140, 149-150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (West Supp. 1995); Fed. R. Civ. P. 72(a), 6(a), 6(d).

**DATED: November 6, 2014**
**New York, New York**

**Respectfully Submitted,**

_Ronald Ellis_

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

25